Sonia S. Waisman, Esq., State Bar No. 153010
McCLOSKEY, WARING, WAISMAN & DRURY LLP
1960 East Grand Avenue, Suite 580
El Segundo, CA 90245
Telephone No.: (310) 524-0400
Facsimile No.: (310) 524-0404
swaisman@mwwdlaw.com

Attorneys for Plaintiffs The Standard Fire Insurance Company and
Travelers Casualty and Surety Company

William J. Baron, Esq., State Bar No. 111288
DUANE MORRIS LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105-1127
Telephone No.: (415) 957-3000
Facsimile No.: (415) 957-3001
wjbaron@duanemorris.com

Attorneys for Plaintiff
Great American Insurance Company of New York,
formerly known as American National Fire Insurance Company

John Conway, Esq., State Bar No. 179301
AIWASIAN & ASSOCIATES
725 S. Figueroa Street, Suite 1050
Los Angeles, CA 90017
Telephone No.: (213) 233-9650
Facsimile No.: (213) 233-9651
john.conway@mclolaw.com

Attorneys for Plaintiffs
Vigilant Insurance Company, Century Indemnity Company (as successor to
CCI Insurance Company, as successor to Insurance Company of North America),
Pacific Employers Insurance Company, and Federal Insurance Company

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE STANDARD FIRE INSURANCE COMPANY; TRAVELERS CASUALTY AND SURETY COMPANY; GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, formerly known as American National Fire Insurance Company; VIGILANT INSURANCE COMPANY; CENTURY INDEMNITY COMPANY, as successor to CCI Insurance Company, as successor to | Case No. 5:19-cv-02498 DSF (AFMx) **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** |

| | | | |
|---|---|---|---|
| 1 | Insurance Company of North America; PACIFIC EMPLOYERS | Date: | May 18, 2020 |
| 2 | INSURANCE COMPANY; and FEDERAL INSURANCE | Time: | 1:30 p.m. |
| 3 | COMPANY, | Dept.: | 7D |
| | | Judge: | Honorable Dale S. Fischer |
| 4 | Plaintiffs, | | |
| 5 | v. | Action Filed:  December 30, 2019 |
| | | Trial Date:    None Set | |
| 6 | ESTATE OF BETTY GOLDBERG, DECEASED and ESTATE OF | | |
| 7 | AL GOLDBERG DECEASED, by and through their successor-in-interest, | | |
| 8 | Daniel Rubin; 220 W. GUTIERREZ, LLC, a California limited liability | | |
| 9 | company, | | |
| 10 | Defendants. | | |

11

12 ///

13 ///

14 ///

15 ///

16 ///

17 ///

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28

# **TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................. 1

II.   FACTS ........................................................................................... 2

      A.    History of Property Ownership, Investigation and Past Litigation ...... 2

      B.    The History of Operations Involving PCE at the Property ................. 4

      C.    The Underlying Lawsuits ............................................................ 4

            1.    The Underlying Federal Action ........................................... 4

            2.    The Underlying State Action .............................................. 5

      D.    The Insurance Policies ............................................................. 5

III.  LEGAL STANDARDS .................................................................... 8

      A.    The Standard for Summary Judgment .................................... 8

      B.    The Controlling Standard Under Probate Code §§ 550-555 ............... 8

      C.    Burdens on Summary Judgment to Prove Applicability of Pollution
            Exclusion and Non-Applicability of "Sudden and Accidental"
            Exception ............................................................................. 10

IV.   LEGAL ARGUMENT ................................................................... 11

      A.    The Pollution Exclusions in the Policies at Issue Bar Coverage
            for the Underlying Lawsuits as a Matter of Law. ............................. 11

            1.    It is undisputed that property damage alleged in the
                  Underlying Lawsuits resulted from the release of pollutants
                  and, therefore, falls within the scope of the pollution exclusion. 11

            2.    The record shows that Defendants lack evidence to establish
                  that the exception to the Pollution Exclusion applies .............. 12

                  a.    *The "sudden" and "accidental" exception applies
                        only where the discharge was temporally abrupt and
                        was not a routine part of operations.* ............................ 12

i

b.  *Defendants cannot meet their burden by offering speculation of a "sudden and accidental" release; rather, Defendants must provide evidence establishing particular sudden and accidental releases of pollutants and prove those releases contributed substantially to causing property damage.* .................................................14

c.  *The record shows that Defendants cannot meet their burden of proving that the "sudden and accidental" exception applies.* ..........................................16

    i.  *Fact witness testimony shows no evidence that sudden and accidental spills caused an appreciable amount of contamination during the Insurers' policy periods.* ..............................16

    ii.  *The only identified PCE "release" happened after the most recent Policy expired in 1986 and, therefore, could not have resulted in property damage (covered or otherwise) during the policy periods.* ................................................20

    iii.  *Defendants' expert reports in the Underlying Federal Action provide no evidence of sudden and accidental contaminant releases.* ..................21

    iv.  *The record contains no evidence that could create a material fact question.* ...........................24

V.  CONCLUSION .........................................................................................25

# **TABLE OF AUTHORITIES**

**Cases**

*Aeroquip Corp. v. Aetna Cas. & Sur. Co.*
26 F.3d 893 (9th Cir. 1994) ................................................................ 10, 12

*Aggio v. Estate of Aggio*
No. C 04-4357 PJH, 2008 WL 2491697 (N.D. Cal. June 19, 2008) ....... 8, 9

*American States Ins. Co. v. Sacramento Plating, Inc.*
861 F. Supp. 964 (E.D. Cal. 1994) .................................................... 13, 22

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ................................................................................. 8

*Aydin Corp. v. First State Ins. Co.*
18 Cal. 4th 1183 (1998) ....................................................................... 9, 10

*Buena Vista Mines, Inc. v. Industrial Indem. Co.*
87 Cal. App. 4th 482 (2001) ................................................................... 20

*Cal. Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp.*
298 F. Supp.2d 930 (E.D. Cal. 2003) ....................................................... 8

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) ................................................................................. 7

*Cline v. Indus. Maint. Eng'g & Contracting Co.*
200 F.3d 1223 (9th Cir. 2000) ................................................................. 8

*Escobedo v. Estate of Snider*
14 Cal. 4th 1214 (1997) ........................................................................... 9

*Estate of Betty Goldberg, Deceased, et al. v. Goss-Jewett Co., Inc., et al.*
Case No. 5:14-cv-01872-DSF (SHx)
2016 WL 7477726, n.2 (C.D. Cal. June 3, 2016) (ECF No. 398.) ............. 3

*Highlands Ins. Co. v. Aerovox Inc.*
(1997) 424 Mass. 226 [676 N.E.2d 801, 806] ......................................... 14

*Home Indem. Co. v. Hoechst Celanese Corp.*
(1998) 128 N.C. App. 189 [494 S.E.2d 774, 784] ................................... 14

*Lumbermens Mut. Cas. Co. v. Belleville Industries, Inc.*
938 F.2d 1423 (1st Cir. 1991) ................................................................ 13

*Miller Marital Deduction Trust v. Estate of Dubois*
2018 WL 3245038 (E.D. Cal. July 2, 2018) ............ 9, 10, 11, 15, 20, 21, 23

*Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*
739 F.2d 624 (Fed. Cir. 1984) ................................................................ 19

*Shell Oil Co. v. Winterthur Swiss Ins. Co.*
12 Cal. App. 4th 715 (1993) ................................................................... 12

*Smith v. Hughes Aircraft Co.*
22 F.3d 1432 (9th Cir. 1993) ...................................................... 12, 13, 22

*Standun, Inc. v. Fireman's Fund Ins. Co.*
62 Cal. App. 4th 882 (1998) ................................................................... 12

*State of Cal. v. Allstate Ins. Co.*
45 Cal. 4th 1008 (2009) ............................................. 10, 11, 12, 14, 20

iii

*Stewart v. Bohnert*
      101 Cal. App. 3d 978 (1980) ........................................................................ 9


**Statutes**

42 United States Code section 9601(14) ............................................................. 10

California Health & Safety Code section 25281(g) ............................................. 10

California Probate Code section 550 ................................................................ 2, 8

California Probate Code section 552 ..................................................................... 2

California Probate Code section 553 ................................................................ 2, 8

California Probate Code section 554 ................................................................ 2, 8

California Probate Code section 721 ..................................................................... 8

California Probate Code sections 550-555 .................................................. 1, 4, 5, 8


**Rules**

Federal Rules of Civil Procedure Rule 56(a) ....................................................... 8

Federal Rules of Civil Procedure Rule 56(f) ..................................................... 22

Plaintiffs THE STANDARD FIRE INSURANCE COMPANY ("Standard Fire"), TRAVELERS CASUALTY AND SURETY COMPANY ("Travelers"), GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, formerly known as American National Fire Insurance Company ("Great American"), VIGILANT INSURANCE COMPANY ("Vigilant"), and CENTURY INDEMNITY COMPANY, as successor to CCI Insurance Company, as successor to Insurance Company of North America ("Century"), PACIFIC EMPLOYERS INSURANCE COMPANY ("PEIC"), and FEDERAL INSURANCE COMPANY ("Federal") (collectively "Plaintiffs" or "Insurers"), submit this Memorandum of Points and Authorities in support of their Motion for Summary Judgment or, in the alternative, Partial Summary Judgment.

## I.       INTRODUCTION

The Insurers brought this action seeking a judicial determination and declaration that they, and each of them, owe no duty to indemnify in connection with two underlying lawsuits arising out of alleged environmental contamination.  The Defendants in this case – the Estate of Betty Goldberg, Deceased, and Estate of Al Goldberg, Deceased (collectively, the "Goldberg Estates"), and 220 W. Gutierrez, LLC ("Gutierrez LLC") – filed the underlying actions in federal and state courts against the Insurers' policyholders, including a suspended dry cleaning supply corporation ("Goss-Jewett"), certain living former officers and directors of Goss-Jewett, and the estates of various deceased alleged past officers, directors and/or shareholders of Goss-Jewett, including the Estate of Robert W. Schack, Deceased and the Estate of Benjamin F. Fohrman, Deceased (collectively, the "Underlying Estate Defendants").

The Goldberg Estates and the Gutierrez LLC seek to recover from the Insurers in the underlying lawsuits, by suing the Underlying Estate Defendants "to the extent of [the] estate's assets … pursuant to California Probate Code §§ 550 through 555 to

establish the decedent's liability for which he was protected by liability insurance policies." (*See, e.g.,* Case No. 5:14-cv-01872-DSF (SHx), ECF No. 1, Cmplt. ¶¶ 11, 12.) Probate Code sections 550-555 permit a claimant to sue a decedent's estate to access insurance covering the decedent's liability (hereinafter, a "Section 550 Claim"). Such proceedings "shall be in the name of the estate" (Cal. Prob. Code § 552), and recovery is limited to damages "within the limits and coverage" of the applicable insurance. (Cal. Prob. Code § 554.) "The insurer may deny or otherwise contest its liability in an action under [Probate Code §§ 550-555] or by an independent action." (Cal. Prob. Code § 553.) If the insurance policies in question do not cover the harm claimed by the plaintiff, a Section 550 Claim fails as a matter of law. (Cal. Prob. Code § 554.)

Each of the insurance policies at issue contains a pollution exclusion that precludes coverage for the Underlying Estate Defendants' alleged liability. Therefore, the claims asserted by the Goldberg Estates and the Gutierrez LLC under the Probate Code fail as a matter of law, and the Insurers are entitled to summary judgment in this action. In the alternative, this Motion seeks partial summary judgment as to Plaintiffs' claims under each individual insurance policy at issue, based on the pollution exclusions in each respective policy.[1]

## II.    FACTS

### A.    History of Property Ownership, Investigation and Past Litigation

Al and Betty Goldberg (the "Goldbergs") acquired property at 220 West Gutierrez Street in Santa Barbara (the "Property") in the 1960s. (UF No. 1.) They operated a dry cleaning supply business there under the name Tri-County Sales ("Tri-County"). (UF No. 2.) The Goldbergs later sold their interest in Tri-County,

---

[1] This Motion is based on issues common to all of the policies at issue. Each Insurer may have other coverage defenses that may be unique to one or more of the policies. All such coverage defenses are not waived by this Motion, and each of the Insurers reserves all rights to subsequently address such issues if the case is not resolved on this Motion.

2

but retained ownership of the Property. (UF No. 4.)  In 1980, Tri-County was sold to Goss-Jewett, which continued to conduct the same business at the Property.  (UF No. 8.)  In 1991, the Goldbergs transferred the Property to the Al Goldberg and Betty Goldberg Revocable Trust utd 1/2/91 (the "Goldberg Trust"), which owned the Property until 1996, when the Property was transferred to Betty Goldberg, who passed away in 2003. (UF Nos. 9-11.)

In 1993, the California Regional Water Quality Control Board ("Water Board") issued a Cleanup & Abatement Order to the Goldbergs, Goss-Jewett and Tri-County, directing them to investigate perchloroethylene ("PCE," also known as "perc") contamination at the Property and to develop a cleanup plan.  (UF No. 12.)  In 1994, the Goldbergs filed a lawsuit, captioned *Goldberg v. Arns, et al.*, Case No. 2:94-cv-03834 (the "1994 Action"), concerning the contaminated Property.  (UF No. 13.)  That lawsuit remained dormant until March 2014, when counsel (Bret Stone) "purporting to represent (the deceased) Al and Betty Goldberg" "attempted to resurrect the long-dormant 1994 action."  (UF No. 14.)  In 2014, the Court dismissed the 1994 Action for lack of prosecution.  (UF No. 15.)

In 2011, the Department of Toxic Substances Control ("DTSC") took over supervision of the Property.  (UF No. 16.)  In 2012, DTSC issued an Imminent and Substantial Endangerment Order to Betty Goldberg, the Goldberg Trust and Goss-Jewett, but DTSC amended the Order in 2013 to remove Betty Goldberg and Goss-Jewett, leaving the Goldberg Trust as the sole responsible party.  (UF No. 17.)

In October 2013, the Goldberg Trust and Gutierrez LLC – the members of which are lawyers who filed the underlying federal court action in the name of the Goldberg Estates – executed a Purchase and Sale Agreement for the Property.  (UF No. 18.) [2]  Apparently later discovering that the Estate of Betty Goldberg, and not the

---

[2]  As this Court noted in the underlying federal action, "[d]espite being named as a plaintiff in this case, there is no evidence that an 'Estate of Al Goldberg' exists or has ever existed." *Estate of Betty Goldberg, Deceased, et al. v. Goss-Jewett Co., Inc., et*

Goldberg Trust, held title to the Property, their counsel changed the sale documents to state that the seller was the Estate of Betty Goldberg.  (UF No. 19; Case No. 5:14-cv-01872-DSF (SHx), ECF No. 398, 2016 WL 7477726, *2.)  Gutierrez LLC's purchase of the Property from the Estate of Betty Goldberg was not consummated until the summer of 2016.  (UF No. 20.)

**B.     The History of Operations Involving PCE at the Property**

        Beginning in the 1960s, when the Goldbergs started the business, Tri-County sold PCE and other dry cleaning supplies at the Property.  (UF No. 3.)  Donald George purchased Tri-County in 1968, and owned the business until he sold it in 1975 to his brother, Terrence George.  (UF No. 43.)  After Terrence's death, Donald George negotiated the sale of Tri-County to Goss-Jewett in 1980.  (UF No. 44.)  Goss-Jewett continued to operate a dry cleaning supply business at the Property until 1991.

        Before 1969, when an above-ground storage tank was installed, PCE was stored on the Property in 55-gallon drums.  (UF No. 5.)  Beginning in 1969, PCE was delivered to the Property by tanker truck and stored in the tank.  (UF No. 6.)  A second storage tank was later installed.  (UF No. 7.)

**C.     The Underlying Lawsuits**

        **1.     The Underlying Federal Action**

        In 2014, the lawyer members of the current Property owner, Gutierrez LLC, filed a federal court lawsuit in the names of the Goldberg Estates, "by and through their alleged successor in interest, Daniel Rubin."  (UF No. 21.)  That suit is captioned *Estate of Betty Goldberg, Deceased, et al. v. Goss-Jewett Company, Inc., et al.,* Case No. 5:14-cv-01872-DSF (SHx) ("Underlying Federal Action").

/ / /

---

*al.,* Case No. 5:14-cv-01872-DSF (SHx), 2016 WL 7477726, n.2 (C.D. Cal. June 3, 2016) (ECF No. 398.)

4

In that action, the Goldberg Estates assert claims against Goss-Jewett; certain living former officers, directors, and/or shareholders of Goss-Jewett; and the Underlying Estate Defendants.  As to the latter, the Goldberg Estates assert claims to the extent of the estates' assets "pursuant to California Probate Code §§ 550 through 555 to establish the decedent's liability for which he was protected by liability insurance policies."  (UF No. 22.)

Certain of the Insurers are defending the Underlying Estate Defendants pursuant to Probate Code §§ 550 through 555, and defending certain living defendants, subject to reservations of rights.  (UF No. 24.)  Insurers Standard Fire, Great American, Century, and Vigilant intervened to defend claims against the suspended Goss-Jewett corporation, subject to reservations of rights.  (UF No. 25.)

### 2.    The Underlying State Action

In December 2017, Gutierrez LLC filed a lawsuit in Santa Barbara County Superior Court captioned *220 W. Gutierrez, LLC v. Goss-Jewett & Co., Inc., et al.*, Case No. 17cv05689 ("Underlying State Action") against the same parties sued in the Underlying Federal Action, seeking the same recovery from the Insurers under Probate Code §§ 550 through 555 as in the Underlying Federal Action, but asserting state and common law causes of action as the alleged basis.  (UF No. 26.)  Subject to their reservations of rights, certain of the Insurers have defended various defendants in the Underlying State Action, which is currently stayed.  (UF No. 27.)

### D.    The Insurance Policies

The following primary liability policies were issued to Goss-Jewett & Co., Inc., under which its executive officers were also insured, but only for their conduct while acting within the scope of their duties as such:

- Vigilant policy number MP 5521 91 94 (11/1/82 to 11/1/83) (the "Vigilant Policy");

/ / /

● Great American policy number BP 6253073-00 (11/1/83 to 11/1/84) (the "Great American Policy");

● Standard Fire Insurance Company policy number 86 SM 887550 (11/1/84 to 11/1/85) (the "Standard Fire Policy"); and

● Insurance Company of North America policy number WDP D1 06 32 36 5 (11/1/85 to 11/1/86) (the "Century Goss-Jewett Policy").  (UF No. 28.)

The following primary liability policies were issued to Tri-County Sales, as to whom Defendants contend Goss-Jewett succeeds:

● Pacific Employers Insurance Company ("PEIC") policies RWP D01301354 (6/25/78-6/25/79), RWP D01307219 (6/25/79-6/25/80) (the "PEIC Policies") (UF No. 28); and

● Insurance Company of North America policy RWP D05785996 (6/25/81-11/1/83) (the "Century Tri-County Policy).  (UF No. 29.)

Subject to the terms, conditions, and exclusions in each of the above-referenced policies, they provide general liability coverage for sums the insured is legally obligated to pay as damages because of property damage caused by an "occurrence," but only if that damage takes place during the policy period.  (UF No. 30.)  The Great American Policy and the Standard Fire Policy each defines "occurrence" to mean "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."  (UF No. 31.)

The Vigilant Policy, the Great American Policy, the Standard Fire Policy, the PEIC Policies and the first two years of the Century Tri-County Policy each contain a pollution exclusion barring coverage for:

bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other

6

irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental*.

(UF No. 32 (emphasis added).)

The Century Goss-Jewett Policy and the 6/25/83 to 11/1/83 period of the Century Tri-County Policy contain a similar "Pollutants and Contaminants" Exclusion, providing in relevant part that Century "won't protect against claims for contamination or pollution of the land, atmosphere, or any body of water, including underground natural water," with an exception for "*claims based on a sudden and accidental discharge or release of pollutants, contaminants or irritants*."  (UF No. 33 (emphasis added).)

In addition to the above-referenced primary policies: During the period of the Great American Policy, Great American issued umbrella excess liability policy number PRO 6253058-00 to Goss-Jewett, subject to substantially the same pollution exclusion as in primary policy number BP 6253073-00 (though designated as Exclusion (g) in the umbrella policy) (UF Nos. 35 and 36); during the period of the Standard Fire Policy, Travelers, then known as The Aetna Casualty and Surety Company ("Aetna") issued umbrella excess liability policy number 86 XS 344064 to Goss-Jewett, subject to substantially the same pollution exclusion as in the Standard Fire Policy (though designated as Exclusion (d) in the umbrella policy) (UF Nos. 37 and 38); during the period of the Vigilant Policy, Federal issued excess policy number 7961-07-38 to Goss-Jewett, subject to substantially the same pollution exclusion as in the Vigilant Policy (UF Nos. 39 and 40); and during the period of the Century Goss-Jewett Policy, Century issued excess liability policy number XBC GO 600534 to Goss-Jewett, which includes a pollution exclusion substantially similar to the exclusions at issue herein.  (UF Nos. 41 and 42.)  Each of these excess policies,

7

like the primary beneath each of them, provide coverage only for covered property damage that takes place during the policy period.  (UF No. 30.)

Thus, each primary and excess policy discussed above (collectively, the "Policies") only provides coverage if and to the extent pollution damage due to sudden and accidental discharges resulted during the policy period.  (UF Nos. 30-33, 36-42.)

## III.    LEGAL STANDARDS

### A.    The Standard for Summary Judgment

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the non-moving party, shows there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a). The moving party has the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the moving party satisfies this burden, the non-moving party "must go beyond pleading and identify facts which show a genuine issue for trial." *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000) (citing *Celotex*, 477 U.S. at 323-24).  "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks omitted).  Summary judgment is warranted if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Cal. Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp.,* 298 F. Supp. 2d 930, 938-39 (E.D. Cal. 2003), citing *Celotex*, 477 U.S. at 322-23.

### B.    The Controlling Standard Under Probate Code §§ 550-555

Probate Code §§ 550-555 allow recovery only "within the limits and coverage" of insurance that covers the decedents' alleged liability.  Cal. Prob. Code

§ 554.  A claimant in such an action "can prove entitlement to indemnity only by demonstrating ***actual coverage*** [not merely a potential for coverage] under the policy for the relief they seek."  *Aggio v. Estate of Aggio*, No. C 04-4357 PJH, 2008 WL 2491697, *5 (N.D. Cal. June 19, 2008) (emphasis added).

Probate Code § 553 provides that insurers may "deny or otherwise contest" coverage "in an action under this chapter or by an independent action."  Moreover, in a Section 550 Claim, the issue of insurance coverage is properly determined on summary judgment *before* a determination of the estates' liability:

> [S]ince recovery against the estate … is limited to the available insurance coverage under Probate Code section 721 [the predecessor to section 550 et seq.], it would be futile to determine the question of liability in the abstract, before determining whether the policy covers such liability.  The very quintessence of a summary judgment motion is to avoid the delay and expense of needless trials. In light of this purpose, it was clearly proper to allow the determination of insurance coverage before the determination of liability.

*Stewart v. Bohnert*, 101 Cal. App. 3d 978, 991 (1980).  *See also Miller Marital Deduction Trust v. Estate of Dubois,* 2018 WL 3245038 (E.D. Cal. July 2, 2018) ("*Miller Marital Trust*") (where attorney Bret Stone represented plaintiffs in a Probate 550 Claim, the District Court rejected plaintiffs' argument that liability must be decided before coverage was decided).[3]

---

[3]   In *Miller Marital Trust*, the Eastern District granted the defendant estates' motions for summary judgment on the Section 550 Claims because the plaintiffs could not meet their burden of proving that contamination at issue was caused by a sudden and accidental release.  *Miller Marital Trust*, 2018 WL 3245038 at *3-*7.  In the same order, the court also denied plaintiff's separate preliminary injunction motion.  The court later granted reconsideration to address the preliminary injunction ruling as to one defendant.  The court's reconsideration of its prior order as to the injunction did not address the pollution exclusion ruling and has no bearing here. *See Miller Marital Deduction Trust v. Estate of Dubois*, No. 2:16-cv-01833-SB, 2018 WL 4326462 (E.D. Cal. Sept. 10, 2018).

9

**C.**   **Burdens on Summary Judgment to Prove Applicability of Pollution Exclusion and Non-Applicability of "Sudden and Accidental" Exception**

Insurers have the burden of proving that a policy exclusion applies, and when the insurer makes that showing, the burden shifts to the policyholder to prove that an exception to the exclusion applies.  *Aydin Corp. v. First State Ins. Co.,* 18 Cal. 4th 1183, 1188 (1998) ("*Aydin*").  The same burdens apply to a plaintiff's effort to prove coverage for a decedent's liability in a Section 550 Claim.  *See, e.g., Miller Marital Trust, supra,* 2018 WL 3245038 at *3-*4, citing *Escobedo v. Estate of Snider*, 14 Cal. 4th 1214, 1228 (1997); *Estate of Aggio*, *supra,* 2008 WL 2491697 at *5-*6 (summary judgment for insurer of defendant estate granted where plaintiffs in a Section 550 Claim could not prove the claim was covered).

As applied to the pollution exclusion, "once the insurer carries its burden of proving that the general pollution exclusion applies, the insured [i.e., the party seeking coverage] bears the burden of proving that the claim comes within the 'sudden and accidental' exception."  *Aydin, supra,* 18 Cal. 4th at 1194; *see also Aeroquip Corp. v. Aetna Cas. & Sur. Co.,* 26 F.3d 893, 895 (9th Cir. 1994) ("*Aeroquip*").  At summary judgment, the party seeking coverage has the burden "to point to specific facts establishing a genuine dispute of material fact for trial.  [Cite omitted.]  Stated differently, the [Defendants here] must put forward evidence that would allow a reasonable jury to find the 'sudden and accidental' exception to the pollution exclusion applies."  *Miller Marital Trust, supra,* 2018 WL 3245038 at *4.

When the pollution exclusion is read together with the policies' other coverage requirements, the policyholder (or other party seeking coverage) also has the burden of showing that an identifiable sudden and accidental pollution event resulted in an appreciable amount of environmental contamination during the policy period.  *Id.*; *State of Cal. v. Allstate Ins. Co.*, 45 Cal. 4th 1008, 1037 (2009) ("*State v. Allstate*").

# IV.   LEGAL ARGUMENT

A.   **The Pollution Exclusions in the Policies at Issue Bar Coverage for the Underlying Lawsuits as a Matter of Law.**

    1.   **It is undisputed that property damage alleged in the Underlying Lawsuits resulted from the release of pollutants and, therefore, falls within the scope of the pollution exclusion.**

The complaints in the Underlying Federal Action and the Underlying State Action (collectively, "Underlying Lawsuits") allege that the Property is contaminated from releases of hazardous substances, including PCE.  (RJN, Exh. BB, Cmplt. ¶¶ 30 and 39; RJN, Exh. CC, Cmplt. ¶ 27.)  In their complaint in the Underlying Federal Action, the Goldberg Estates acknowledged that PCE is "a toxic, long-lived, volatile chlorinated hydrocarbon and likely carcinogen," and that "PCE and many of its degradation products … are each a hazardous substance as that term is defined by federal law, 42 U.S.C. § 9601(14), and state law, Cal. Health & Safety Code § 25281(g), and are each a hazardous waste and solid waste as those terms are defined in federal law."  (*See* RJN, Exh. BB, Cmplt. ¶ 27.)  PCE is a toxic chemical and a pollutant within the meaning of the pollution exclusion.

The pollution exclusion in most of the Policies excludes coverage for "property damage arising out of the discharge, dispersal, release or escape of . . . toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water…."  (UF Nos. 32, 36, 38, 40, and 42.)  The Pollutants and Contaminants Exclusion in the Century Goss-Jewett Policy and the 6/25/83 to 11/1/83 period of the Century Tri-County Policy bars claims for "contamination or pollution of the land, atmosphere, or any body of water, including underground natural water."  (UF No. 33.)  Thus, the pollution exclusions apply to bar coverage here.

---

11

Accordingly, Defendants can only prevail on their claims in the Underlying Lawsuits if they carry their burden of showing that "sudden and accidental" contaminant discharges caused an appreciable amount of contamination during the Insurers' respective policy periods.  *See, e.g., State v. Allstate, supra*, 45 Cal. 4th at 1037 (party seeking coverage must "identify particular sudden and accidental events and prove they ***contributed substantially***" to contamination) (emphasis added); *Miller Marital Trust*, *supra*, 2018 WL 3245038 at *3-*7.

2.      **The record shows that Defendants lack evidence to establish that the exception to the pollution exclusion applies.**

a.      ***The "sudden" and "accidental" exception applies only where the discharge was temporally abrupt and was not a routine part of operations.***

The proper inquiry when evaluating the "sudden and accidental" exception is on the release of contaminants, and not on the resulting damage caused by the release; it is irrelevant whether the insured expected injury or damage to result.  *See, e.g., State v. Allstate, supra,* 45 Cal. 4th at 1020 ("accidental" in the exception to the pollution exclusion means "an unexpected or unintended *discharge*, not unexpected or unintended *damage*") (emphasis in original); *Standun, Inc. v. Fireman's Fund Ins. Co.*, 62 Cal. App. 4th 882, 889, 890 (1998) (pollution exclusion focuses on the discharge of pollutants, not on environmental damage caused by the discharge or whether the insured expected or intended any damage).

The pollution exclusion applies unless the "discharge, dispersal, release or escape [of pollutants] is sudden and accidental."  (UF Nos. 32, 33, 36, 38, 40, and 42.)  California courts repeatedly and consistently hold that the "sudden and accidental" exception unambiguously includes an abrupt, temporal requirement, and

/ / /

/ / /

12

that this policy wording does not permit coverage for gradual releases or ongoing releases that are part of routine operations.[4]

In cases involving ongoing contaminant releases, California courts have rejected policyholder efforts to blame pollution losses on minor, sporadic, purported "sudden" discharges within a long history of routine, gradual releases of pollutants. For example, in *Smith v. Hughes Aircraft Co.,* 22 F.3d 1432 (9th Cir. 1993), the Ninth Circuit affirmed summary judgment for the insurers on this issue, holding that:

> . . . Hughes' argument that certain "sudden" polluting events partially caused the injuries to the Venezuela claimants also fails. These "sudden" polluting events caused TCE and other toxic chemicals to be dumped directly into Hughes' unlined ponds. They occurred when the waste treatment plant broke down or was over-capacitated or when TCE was spilled onto the work floor and was pushed into a drain that bypassed the treatment plant. The district court properly rejected Hughes' effort to "break down its long-term waste practices into temporal components in order to find coverage where the evidence unequivocally demonstrates that the pollution was gradual. Accordingly, we affirm the district court's grant of summary judgment for the Insurers regarding the pollution exclusion."

*Id.* at 1438; *see also American States Ins. Co. v. Sacramento Plating, Inc.,* 861 F. Supp. 964, 971 (E.D. Cal. 1994), *aff'd w/o published op.,* 99 F.3d 1145 (9th Cir. 1996) (summary judgment for insurer where "the ordinary splashing, spilling, and

---

[4] *See, e.g., Aeroquip, supra,* 26 F.3d at 894 ("the 'sudden and accidental' exception to the pollution exclusion necessarily incorporates a notion of temporal brevity," quoting approvingly from earlier Ninth Circuit case and affirming summary judgment for insurer); *Shell Oil Co. v. Winterthur Swiss Ins. Co.,* 12 Cal. App. 4th 715, 754-55 (1993) ("'sudden' necessarily contains a temporal element," and "conveys the sense of an unexpected event that is abrupt or immediate in nature;" because the court held that "accidental" meant "unexpected and unintended," it concluded that "sudden" must include a temporal connotation—i.e., "having a comparatively quick onset"—to give it any meaning beyond "accidental").

dripping of chemicals during the plating process occurred for years;" three identified incidents were not sufficient for the "sudden and accidental" exception to apply).

As the District Court in *Smith v. Hughes* recognized, it is "'illogical to believe that insurers intended through the sudden and accidental exception to buy into a risk' of insuring pollution-prone operations." *Smith v. Hughes Aircraft Co.,* 783 F. Supp. 1222, 1231-32 (D. Ariz. 1991), quoting *Lumbermens Mut. Cas. Co. v. Belleville Industries, Inc.,* 938 F.2d 1423 (1st Cir. 1991).

> **b.      Defendants cannot meet their burden by offering speculation of a "sudden and accidental" release; rather, Defendants must provide evidence establishing particular sudden and accidental releases of pollutants and prove those releases contributed substantially to causing property damage.**

As a matter of law, the Policies do not cover the claims in the Underlying Lawsuits unless Defendants can establish that the exception to the pollution exclusion applies.  As the California Supreme Court has explained, the "sudden and accidental" exception does not apply unless policyholders (or any party seeking coverage) produce evidence of *particular* sudden and accidental releases that *contributed substantially* to the contamination at issue.  *State v. Allstate, supra,* 45 Cal. 4th at 1020.  Mere speculation as to such release(s) is not sufficient:

> Cases have properly held against indemnity where the insured can make only "unsubstantiated claims of sudden and accidental discharges in the face of repeated, continuous discharges in the course of business." ([*South Macomb Disposal Authority v. American Ins. Co.* (1997) 572 N.W.2d 686] at p. 705; *see Travelers Casualty & Surety Co. v. Superior Court* [(1998) 63 Cal. App. 4th 1440] at p. 1460 [insured "must do more than point to possible" sudden and accidental events; it must show such events caused an "appreciable

amount of environmental damage"]; *Highlands Ins. Co. v. Aerovox Inc.* (1997) 424 Mass. 226 [676 N.E.2d 801, 806] [insured must show sudden and accidental event caused "more than a de minimis amount of the damages for which it is now liable"]; *Home Indem. Co. v. Hoechst Celanese Corp.* (1998) 128 N.C. App. 189 [494 S.E.2d 774, 784] [same].) ***Only if the insured can identify particular sudden and accidental events and prove they contributed substantially to causing indivisible property damage*** for which the insured bore liability is the insurer obliged to indemnify its insured for the entirety of the damages.

*State v. Allstate*, *supra,* 45 Cal. 4th at 1037 (emphasis added).  Thus, even if limited evidence of isolated incidents of unexpected releases exists, such evidence does not suffice to prove coverage in the context of a long history of ongoing, gradual pollution.  Here, evidence of even limited releases causing harm is lacking.

Defendants' counsel (Mr. Stone) is well aware of these standards, having represented the plaintiffs in *Miller Marital Trust*, in which the Eastern District dismissed a Section 550 Claim on summary judgment based on the same pollution exclusion.  That court rejected the plaintiffs' effort to avoid summary judgment by presenting "nothing more than speculation," such as expert opinions that were "speculative" or "circumstantial evidence of what *may* have happened at the Property," as the plaintiffs "fail[ed] to identify any 'particular sudden and accidental event' that 'contributed substantially' to the contamination at issue in [that] case." *Miller Marital Trust, supra,* 2018 WL 3245038 at *4, *7 (emphasis in original).  As detailed below, the same insufficiencies and defects in evidence exist here, warranting the same result – the grant of summary judgment for the Insurers.

        **c.**     ***The record shows that Defendants cannot meet their burden of proving that the "sudden and accidental" exception applies.***

        **i.**     ***Fact witness testimony shows no evidence that sudden and accidental spills caused an appreciable amount of contamination during the Insurers' policy periods.***

In the 1994 Action and again in the Underlying Federal Action, numerous fact witnesses have been deposed, and their testimony identified no particular incidents of PCE releases that could fall within the "sudden and accidental" exception to the pollution exclusion.  Instead, witnesses have testified that there were ongoing minor drips and leaks that did not release contaminants to the environment, or there were expected releases caused by truck drivers who delivered PCE to the premises.[5]  The record is devoid of evidence that any sudden and accidental release caused any appreciable amount of contamination during the policy periods at issue.

For example, Donald George (who was at the Property 1968-1980)[6] testified in 1994 that he was not aware of any spills or leaks of PCE at the Property.  (UF No. 45.)  In 2015, he clarified and elaborated on his testimony.  In the later deposition, he testified that PCE evaporates very quickly.  (UF No. 46.)  He added that although small drips of PCE from containers were routine and ongoing at the Property, any such small drips of PCE that leaked or dripped at the Property evaporated "just like that," and he testified that in his experience no unevaporated PCE remained to be cleaned up as a result of such routine, ongoing dripping.  (UF No. 48.)  He further testified that he did not recall any large spills of PCE at the Property, and specifically

---

[5]  As addressed in Section IV.A.2.c.ii, *infra*, one witness testified about an alleged PCE spill at the Property, but that witness began working at the Property *after* the last of the Policies had expired, and any such alleged spill after the policy period cannot give rise to coverage.

[6]  More specifically, Donald George acquired Tri-County in 1968 and owned the business until he sold it to his brother, Terrence George, in 1975.  (UF No. 43.)  After the sale, Donald continued as a consultant to Tri-County, and negotiated the sale of Tri-County to Goss-Jewett in 1980.  (UF No. 44.)

16

testified that he had "no recollection of any spill that would be that large that it wouldn't evaporate in a very short period of time, which it does." (UF No. 47.)

Donald George did recall that the tanker truck driver who delivered PCE to the Property, on behalf of the supplier, routinely discharged PCE into a sewer. (UF No. 49.) Mr. George testified that after the driver filled the PCE tank at the Property, the driver laid the hose in the street with the end in a drain to the sewer, allowed any PCE in the hose to drain into the sewer, and then put the hose away:

> What I observed is that he would lay the hose out in the street, make
> sure it contained no residue, and then put it back in the truck.
>
> * * *
>
> There was a drain to the sewer line right there.
>
> Q: He wouldn't just put it in the street; he would put it in to the sewer line?
>
> A: That's what I observed.

(UF No. 49.) When asked whether he ever observed any PCE coming out of the hose when it was dragged back to the truck, Mr. George responded:

> If it would have been significant, it would have ruined the asphalt that
> was there. So whatever there was when he dragged it back would be
> drops of [PCE]. It would not have been gallons of [PCE].

(UF No. 50.)

Mr. George's testimony reveals no sudden and accidental PCE releases at the Property during the time he was involved in the business between 1968 and 1980. To the contrary, his testimony indicates that any PCE releases from Tri-County or Goss-Jewett's operations amounted to routine and ongoing dripping, involving such small amounts of PCE that it would immediately evaporate. (UF Nos. 46-50.) As a matter of law, any such releases are not sudden and accidental.

Moreover, any PCE releases caused by the truck driver who regularly delivered PCE to the Property – and who purposely allowed PCE to drain from the

17

delivery hose into the sewer – were both ongoing and deliberate, and thus neither sudden nor accidental within the meaning of the exception to the pollution exclusion. (UF Nos. 49 and 50.)

Testimony of other fact witnesses also fails to provide any evidence of sudden and accidental releases causing damage during the Policy periods.  For example, Flemming Andersson worked for Tri-County and then Goss-Jewett at the Property from 1979 until approximately 1991.  (UF No. 51.)  When asked whether he had occasion to observe nozzles from any of the tanks left on the ground rather than on a hook, he speculated that it would have happened, but had no specific recollection of any particular occasion when it happened, and he further stated, "***that would have been part of the daily operation***, and I don't recall that."  (UF No. 52 (emphasis added).)  Fleming Anderson further testified that that he knew of no spills at the Property.  (UF No. 52.)

Darold Merritt was vice-president of Goss-Jewett when it acquired Tri-County in 1980; he also became president and treasurer of Tri-County at that time.  (UF No. 53.)  When asked whether he had heard "of any kind of accidents or mistakes made by employees" of Tri-County before he became involved in 1980, he said no.  (UF No. 54.)  Other than having been told by Mr. Stone  of an unspecified employee interview in the 1990s "that related to any kind of spill of perc" at the Property, Mr. Merritt testified that he had not heard from anyone who worked at the Property about any PCE spills or overfill accidents at that location, and he himself had no recollection or knowledge of any accidents:  "***I know of no accidents*** happening [at the Property]."  (UF No. 55 (emphasis added).)

Other witnesses also testified that they had no knowledge of any spills of any kind, any overfills, loose hoses, or hoses left on the ground at the Property.[7]

_____

[7] *See, e.g.,* UF No. 56:  Testimony of Ray Hanacek, who started working at the Property in 1978; Testimony of Carol George, who handled Tri-County business and acted as president of the company in or about 1979-80 as executor of her ex-

Thus, after extensive discovery in the 1994 Action and discovery over several years in the Underlying Lawsuits – now more than *33 years* after the most recent Policy expired, the record is devoid of any evidence that could raise a fact question as to any alleged particular "sudden and accidental" release before or during the policy periods – let alone any particular release at any time that "contributed substantially" to causing the contamination at issue (*see* Section IV.A.2.c.ii, *infra*).

Defendants have identified no evidence of a sudden and accidental pollution release within coverage under the exception to the pollution exclusion, and they have no plausible argument that any further discovery might reveal relevant new evidence on this issue.[8] In the absence of such evidence, Defendants are not permitted to overcome this Motion by mere speculation of a sudden and accidental discharge. *See, e.g.,* Fed. R. Civ. Proc., Rule 56(f); *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 627 (Fed. Cir. 1984) ("Summary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." (Citation omitted.) As such, the testimony is devoid of any evidence necessary for Defendants to meet their burden to overcome this Motion.

/ / /

/ / /

/ / /

/ / /

---

husband's estate (never heard about or saw any spills, overfills or tank leaks); Testimony of Betty Goldberg (testifying that there were never any spills of PCE or any other chemical at the Property); Testimony of Harlan "Buzz" Anderson (although he did not start working at the Property until 1987 – after all of the Policies had expired – he testified that he never heard about any overfills of the storage tanks or any container at the Property, any spill in the process of transferring from one container to another, any spotting chemicals falling at any time, any 55-gallon drum falling at any time, any forklift crashing into a 55-gallon drum, or anyone ever backing into the storage tanks with a delivery truck or forklift).

[8] Any other fact witnesses regarding operations at Tri-County and/or Goss-Jewett who have been identified are deceased. (UF No. 57.)

19

1
2
3
4

        ***ii.***       ***The only identified PCE "release" happened after the most recent Policy expired in 1986 and, therefore, could not have resulted in property damage (covered or otherwise) during the policy periods.***

5

      Numerous past employees of Tri-County and/or Goss-Jewett, all of whom

6

worked at the Property, testified in the 1994 Action and/or in the Underlying Federal

7

Action. There is only one witness who testified that he saw any actual PCE spill at

8

the Property, and that witness first worked at the Property in 1987 – *after* the most

9

recent Policy had expired on November 1, 1986. (UF No. 58-61.)

10

      Specifically, Harlan "Buzz" Anderson worked in Goss-Jewett's warehouse at

11

the Property from February 1987 until November or December of 1987. (UF No.

12

60.) He testified that he witnessed only one overfill incident while he worked there.

13

(UF No. 59.) To the extent any such incident witnessed by Buzz Anderson occurred,

14

it could not have caused property damage *during the policy period*, as required under

15

each of the Policies. (UF No. 58.)

16

      In any event, Buzz Anderson testified that the majority of the estimated five to

17

seven gallons or less of PCE spillage was *into the bed of the delivery truck*, there was

18

no pooling of PCE on the asphalt, and only a little bit trickled down to the ground.

19

(UF No. 61.) He testified that the entire overfill incident lasted no more than the

20

moments it took to run from his car to the truck, took no more than a minute or so to

21

clean up with sawdust, and did not damage any of the goods that were already loaded

22

in the truck (which was his main concern at the time) even though *essentially all of*

23

*the spill was in the truck and did not reach the ground*. (*Id.*) And again, this

24

incident occurred *after* the Policy periods. Thus, even if, *arguendo*, testimony

25

regarding this alleged incident might suffice to raise a material fact question – which

26

it does not, because the testimony does not show that PCE was released into the

27

ground – as a matter of law such a release in 1987 or later could not have caused

28

damage during the policy period of the policies that expired before 1987.  *See, e.g., State v. Allstate*, *supra*, 45 Cal. 4th at 1037 (no coverage unless policyholder or entity seeking coverage "can identify particular sudden and accidental events ***and prove they contributed substantially to causing indivisible property damage***") (emphasis added)); *Buena Vista Mines, Inc. v. Industrial Indem. Co.*, 87 Cal. App. 4th 482, 487 (2001) (a claim is not even potentially covered unless "the alleged harm occurred within the policy period . . . it is neither reasonable nor consonant with the terms of general liability policies to require insurers to cover liabilities based upon facts that did not occur until after the policy period").

Further, there is no record of Mr. Anderson or anyone else notifying any insurer, fire department, or environmental agency of this incident, as would have been required had a substantial release taken place.  The absence of any such action speaks to the minimal nature of this supposed incident relative to the current alleged multi-million-dollar cleanup.

> ### iii.    Defendants' expert reports in the Underlying Federal Action provide no evidence of sudden and accidental contaminant releases.

The Insurers anticipate that Mr. Stone will offer expert reports in an effort to avoid summary judgment, as he attempted in *Miller Marital Trust*.  *See Miller Marital Trust, supra,* 2018 WL 3245038 at *5 (court rejected plaintiffs' efforts to manufacture contrived evidence of covered "sudden and accidental" events).

Here too, Defendants' experts merely speculate, based on supposed conclusions about "ordinary business practices" or assumptions made decades after the fact, but with no firsthand knowledge of any particular sudden and accidental release, let alone a release that "contributed substantially" to pollution during any Insurer's policy period.  That is not sufficient to overcome this Motion.

For example, in his 2016 expert report proffered by the Goldberg Estates in the Underlying Federal Action, Lee A. Swanger referred in large part to the "type" of releases, leaks and drippage that fact witnesses testified were part of routine operations.  Swanger did not refer to any particular release, other than the alleged overfill incident in the truck bed, which – if it took place at all – happened in or after 1987.  (Declaration of Christopher Johnson ("Johnson Decl."), ¶ 19; Appendix of Exhibits ("Appendix"), Exh. P (*see, e.g.,* pp. 10-12).)  And just like the reports that Mr. Stone presented in *Miller Marital Trust* speculating about alleged PCE releases during removal of a concrete slab, here Swanger also speculates about PCE releases from cracks in a concrete slab.  (*Id.* at p. 11, ¶ 11).)  Such speculation is no more sufficient to overcome summary judgment here than in *Miller Marital Trust.*

Similarly, in the 2015 expert report of Scott Warner proffered by the Goldberg Estates in the Underlying Federal Action, he also speculated as to routine and repeated releases:

> From my experience, it is my opinion that the solvent solution containing PCE was likely released to the ground on numerous occasions during times of tank filling or distribution from the tank for customer sales. It is also my opinion that PCE solution was likely washed from equipment or filling devices during normal routine activities, which also would have resulted in PCE being distributed to the ground surface.

(Johnson Decl., ¶ 20; Appendix, Exh. Q at p. 4.)  This testimony is not based on evidence regarding actual events at the Property, but is mere speculation regarding what Warner asserts "likely" happened there.  Moreover, even if this testimony had evidentiary support – which it does not – it would *defeat* Defendants' position rather than support it.  Any such testimony regarding "normal routine activities" paints a picture of ongoing, routine leaks and releases, each of an inconsequential nature that,

1   when taken together over decades, amounted to an ongoing systemic pollution

2   problem that falls outside the exception to the pollution exclusion as a matter of law.

3   *See, e.g., Smith v. Hughes Aircraft Co., supra,* 22 F.3d at 1438 (quoted above at p.

4   13); *American States Ins. Co. v. Sacramento Plating, Inc., supra,* 861 F. Supp. at 971.

5         Later in Warner's report, he speculated, without any factual support, that:

6           The general operations involved transferring the PCE dry cleaning

7           solvent from the 5,000 gallon AST [above-ground storage tank] to

8           trucks delivering it to customers . . . PCE was likely released in the

9           area of the ASTs either through a breach in the tank, overfill of the

10          tank, overfill of the tanker trucks, or other acts causing or

11          permitting sudden and accidental discharges of hazardous wastes.

12  (Appendix, Exh. Q at p. 11.)  Once again, the expert is merely speculating.  By

13  stating that PCE was "likely" released through one or another hypothetical means, the

14  report confirms that Warner is speculating and that he does not know how PCE

15  actually was released.  And his speculative "conclusion" that there had been a tank

16  breach is further belied by the fact that no such incident was ever recorded or

17  reported.  Moreover, as in *Miller Marital Trust,* Warner's use of the term "sudden

18  and accidental" is vague and conclusory, and it is an improper legal conclusion to the

19  extent Defendants argue that the term is used in accordance with California case law.

20        The 2016 expert report of Jiann-Wen "Woody" Ju fares no better.  His repeated

21  use of the term "sudden" in his report (Appendix, Exh. O at pp. 3, 5) is vague and

22  conclusory, and amounts to an improper legal conclusion.  As a matter of law, it is

23  not sufficient to meet Defendants' burden of raising a question of material fact.  Both

24  of Ju's hypothesized "damage mechanisms" rely on layers of speculation regarding

25  what theoretically could have happened as a result of cracks in concrete (however

26  caused), with no actual evidence of cracking.  As in *Miller Marital Trust*, such

27  speculation falls short of evidence of a "particular sudden and accidental event" and

28

23

of proving that any such event "contributed substantially" to the contamination.[9]  As in *Miller Marital Trust,* the "issue with this theory" is that it is just a theory, and "with no evidence to support this theory, it amounts to nothing more than speculation."  *Miller Marital Trust, supra,* 2018 WL 3245038 at *5.

### iv.     The record contains no evidence that could create a material fact question.

Even when the evidence is viewed in the light most favorable to Defendants, they cannot establish that the "sudden and accidental" exception to the pollution exclusion applies.  Through three lawsuits and years of litigation and site investigation, Defendants have had ample opportunity to find evidence of a particular sudden and accidental event that contributed substantially to the contamination, if any such event had ever happened.  But they have presented no such evidence.  The record shows that Defendants lack evidence required to meet their burden of proof.  In short, Defendants cannot show that the policies at issue cover the claims in the Underlying Lawsuits, and the Insurers are entitled to summary judgment.

///

///

---

[9]   Notably, when one of the fact witnesses (Ray Hanacek) was specifically questioned as to whether he saw or heard of any damage at the Property from a 1978 earthquake in Santa Barbara shortly after he began working at the Property, he said no.  (Johnson Decl., ¶ 10; Appendix, Exh. G, 67:5-18.)

Mr. Stone even went so far as to present fact witnesses with documents from the Southern California earthquake data center in an extraordinary stretch to extract testimony that might support his expert's speculation, but to no avail.  *See, e.g.,* (Johnson Decl., ¶ 12; Appendix, Exh. I, 54:7-56:20.  Witness Carol George testified that she did not recall ever seeing or hearing about flaws or punctures in the tanks or cracks in the concrete around them.  (*Id.,* 53:24-56:20.)

Buzz Anderson, who did not begin working at the Property until 1987, testified that he observed cracks in concrete around the tanks but stated that they were "[j]ust structural surface cracks in the foundation" and he did not see any caving in of the concrete around the tanks.  (Johnson Decl., ¶ 13; Appendix, Exh. J, 76:24-77:17.)  He testified that he never saw any staining of the concrete or asphalt around the tanks, and that he had never been told or heard about any cracks, leaks, defects or problems with the tanks.  (*Id.,* 76:8-10, 78:5-18.)

24

## V.   CONCLUSION

For all the foregoing reasons, the Insurers ask the Court to grant this Motion and rule that the pollution exclusion in each of the policies at issue applies to negate coverage thereunder for the claims in the Underlying Lawsuits.

In the alternative, if the Court determines that summary judgment is not warranted as to all of the policies at issue, the Insurers ask the Court to grant partial summary judgment as to each policy that the Court deems appropriate.

Dated:  March 25, 2020            McCLOSKEY, WARING, WAISMAN & DRURY LLP

By:*/s/ Sonia S. Waisman*
SONIA S. WAISMAN
Attorneys for Plaintiff
**THE STANDARD FIRE INSURANCE COMPANY and TRAVELERS CASUALTY AND SURETY COMPANY**

Dated:  March 25, 2020            DUANE MORRIS LLP

By:*/s/ William J. Baron*
WILLIAM J. BARON

Attorneys for Plaintiff
**GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, formerly known as American National Fire Insurance Company**

Dated:  March 25, 2020            AIWASIAN & ASSOCIATES

By:*/s/ John Conway*
JOHN CONWAY

Attorneys for Plaintiffs
**VIGILANT INSURANCE COMPANY; CENTURY INDEMNITY COMPANY, as successor to Insurance Company of North America; PACIFIC EMPLOYERS INSURANCE COMPANY; and FEDERAL INSURANCE COMPANY**

25

## ATTESTATION PER LOCAL RULE 5-4.3.4

The e-filing attorney hereby attests that concurrence in the filing of the document has been obtained from each of the other signatories indicated by a conformed signature (/s/) within this efiled document.

Dated:  March 25, 2020                    DUANE MORRIS LLP

                                          By:*/s/ William J. Baron*
                                                WILLIAM J. BARON

                                          Attorneys for Plaintiff
                                          **GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, formerly known as American National Fire Insurance Company**

MEMORANDUM OF POINTS AND AUTHORITIES                    5:19-cv-02498-DSF (AFMx)
DM1\10997673.1